Rel: December 20, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

_____

## CR-2024-0124

_____

## State of Alabama

## v.

## Ray Charles Williams

## Appeal from Montgomery Circuit Court
## (CC-22-620)

McCOOL, Judge.

The State of Alabama ("the State") has appealed the Montgomery Circuit Court's judgment dismissing an indictment charging Ray Charles Williams with capital murder. See § 13A-5-40, Ala. Code 1975. For the

reasons set forth herein, we reverse the circuit court's judgment and remand the case for that court to reinstate the indictment.

Facts and Procedural History

The relevant facts in this appeal are undisputed. In 2004 Johnnie Jackson was murdered during the course of a robbery. While investigating Jackson's murder, the State found a blood-stained shirt, which it submitted to the Department of Forensic Sciences ("the DFS") to "see if they could get a DNA match." (R. 8.) However, "[a]t that time [the State] did not have a DNA reference standard for Williams" (R. 14), and the DFS was unable to provide the State with a DNA match. Williams nevertheless became a suspect in Jackson's murder at some point, for reasons that are not clear from the record, and he was arrested on November 28, 2004, and charged with capital murder. The State presented the capital-murder charge to a grand jury, but the grand jury returned a no bill on May 12, 2006, and Williams was released from custody.

At some point thereafter, Williams "found himself involved in the criminal-justice system to the extent that a DNA reference standard was taken from him" (R. 14), and in 2012 the DFS was able to conclude that

Williams's DNA was on the shirt that the State had submitted for DNA testing eight years earlier. The DFS provided a copy of its report to the Montgomery County Sheriff's Office, but no further action was taken against Williams at that time because the report was "lost in the shuffle." (R. 18.) However, in 2018 another person was implicated in Jackson's murder, which prompted a captain in the Montgomery County Sheriff's Office to review the case file, where he discovered the 2012 DFS report. Following further investigation, the State again presented a grand jury with a capital-murder charge against Williams, and the grand jury indicted Williams on May 12, 2022. Williams was arrested the next month.

In September 2022, Williams filed a motion to dismiss the indictment, arguing that the State had violated his right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution.[1] In support of his motion, Williams cited the four well-established Barker v. Wingo, 407 U.S. 514 (1972), factors that govern a speedy-trial claim,

---

[1]In a footnote, Williams noted that the Alabama Constitution also guarantees a defendant the right to a speedy trial. See Art. I, § 6, Ala. Const. 2022. However, Williams did not argue that the analysis of his speedy-trial claim would be different under the two constitutions.

which are "(1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his or her right to a speedy trial; and (4) the prejudice to the defendant." State v. Jones, 35 So. 3d 644, 646 (Ala. Crim. App. 2009) (citing Barker). Williams then argued that he was entitled to dismissal of the indictment under the Barker factors because, according to him, the State "ha[d] been negligent for 18 years in bringing this matter to trial," and that delay had prejudiced him in various ways. (C. 124.)

The State filed a response to Williams's motion in which it argued that, because the capital-murder charge had been no-billed in 2006, Williams's right to a speedy trial had not been triggered until he was indicted on May 12, 2022, which was only four months before he filed his motion. According to the State, that four-month delay was not sufficient even to trigger a speedy-trial analysis, much less find a speedy-trial violation. The State did not contend that the 18-year preindictment delay was altogether immaterial, but it argued that Williams's only avenue for relief based on that delay was a due-process claim, not a speedy-trial claim. The State argued, though, that Williams was not entitled to relief on a due-process claim, which he had not raised anyway, because,

4

according to the State, to establish a due-process violation based on preindictment delay, Williams was required to prove both "actual prejudice" and "that the delay was the product of deliberate action by the government designed to gain a tactical advantage." (C. 128.) Williams could prove neither element, the State argued, especially given that he had conceded that the State's preindictment delay had been negligent and not deliberate.

Williams's trial was scheduled to occur on March 11, 2024. However, in February 2024, the circuit court held a hearing on Williams's motion and subsequently dismissed the indictment with prejudice. In support of its ruling, the circuit court found that the State had negligently delayed Williams's trial for 10 years, measuring the length of the delay from 2012, when the State learned that Williams's DNA was on the shirt that the State had submitted for DNA testing in 2004. The circuit court also found that Williams had been prejudiced by the negligent delay because "[t]he parties agree that at least two witnesses who were interviewed by investigators in 2004 have since died." (C. 150.) Based on those findings, the circuit court concluded that Williams's "right to a speedy trial ha[d] been violated." (Id.) The circuit court did not

5

address the State's argument that the proper framework in this case is a due-process analysis, rather than a speedy-trial analysis. The State filed a timely notice of appeal.

Discussion

The sole issue in this appeal is whether the State violated Williams's constitutional right to a speedy trial.[2] Because the facts are undisputed, we review Williams's speedy-trial claim de novo, without affording any presumption of correctness to the circuit court's ruling. Wilson v. State, 329 So. 3d 71, 76 (Ala. Crim. App. 2020).

> "In Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court held that when determining whether an accused has been denied his right to a speedy trial, a court must look at: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant's case."

D.B. v. State, 861 So. 2d 4, 16 (Ala. Crim. App. 2003). However,

> "[t]o trigger a speedy-trial analysis, the delay in bringing an accused to trial must be so excessive as to be 'presumptively prejudicial.' Barker, 407 U.S. at 530, 92 S. Ct. 2182. 'Unless the delay is presumptively prejudicial, there is

---

[2]As he did below, Williams notes that both the United States Constitution and the Alabama Constitution guarantee a defendant the right to a speedy trial. Once again, however, Williams does not argue that the analysis of his speedy-trial claim would be different under the two constitutions.

no need to inquire into the other <u>Barker</u> factors.' <u>Roberson v. State</u>, 864 So. 2d 379 (Ala. Crim. App. 2002)."

<u>D.B.</u>, 861 So. 2d at 17. In other words, a speedy-trial claim may fail on the first <u>Barker</u> factor alone -- the length of the delay. <u>See</u> <u>Summerlin v. State</u>, 594 So. 2d 235, 237 (Ala. Crim. App. 1991) (holding that, because the length of the delay was "not presumptively prejudicial," this Court was "not required to address the remaining three [<u>Barker</u>] factors").

It is well settled that, for purposes of a speedy-trial claim, "'[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant -- whichever is earlier -- to the date of the trial.'" <u>Wilson</u>, 329 So. 3d at 77 (quoting <u>Ex parte Walker</u>, 928 So. 2d 259, 264 (Ala. 2005)) (other citation omitted). Thus, the State argues that the length of the delay in this case must be measured from May 12, 2022 -- the date Williams was indicted for Jackson's murder -- because Williams was arrested following the return of the indictment. The State acknowledges that Williams was arrested for Jackson's murder 18 years before the indictment and was incarcerated at that time for 17 months. However, given that a grand jury no-billed the capital-murder charge in 2006 and that Williams was released from custody, the State argues that Williams's 2004 arrest is no longer relevant and that any preindictment

delay would be relevant only to a due-process claim, not a speedy-trial claim. Williams argues in response that the length of the delay must be measured from November 28, 2004, which was the date he was first arrested for Jackson's murder. Thus, the threshold issue for this Court to resolve is the parties' disagreement over the length of the delay.[3]

There is support for the State's argument in <u>United States v. MacDonald</u>, 456 U.S. 1 (1982). In that case, the United States Army charged Jeffrey MacDonald with three murders in May 1970, but, following an investigation, the Army dismissed the charges later that year. Although the charges had been dismissed, the investigation into the murders continued, and a federal grand jury indicted MacDonald for the three murders in January 1975. MacDonald then filed a motion to dismiss the indictment, arguing that the Government had violated his right to a speedy trial. The United States Supreme Court rejected that argument, holding that "the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue

---

[3]Before addressing that issue, we note that the length of the delay is not to be measured from 2012, which is the date the circuit court used in its speedy-trial analysis. Williams was neither in the State's custody nor under indictment at that time.

delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause."  MacDonald, 456 U.S. at 7.  This is so, the Court explained, because,

> "[o]nce charges are dismissed, … the formerly accused is, at most, in the same position as any other subject of a criminal investigation.  Certainly the knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life.  This is true whether or not charges have been filed and then dismissed. … But with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending.  After the charges against him have been dismissed, 'a citizen suffers no restraints on his liberty and is [no longer] the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer.' United States v. Marion, 404 U.S. [307,] 321, 92 S. Ct. [455,] 463 [(1971)].  Following dismissal of charges, any restraint on liberty, disruption of employment, strain on financial resources, and exposure to public obloquy, stress and anxiety is no greater than it is upon anyone openly subject to a criminal investigation."

MacDonald, 456 U.S. at 8-9.  Thus, the Court held:

> "[T]he homicide charges initiated by the Army were terminated less than a year after the crimes were committed; after that, there was no criminal prosecution pending on which MacDonald could have been tried until the grand jury, in January 1975, returned the indictment on which he was tried and convicted.  During the intervening period, MacDonald was not under arrest, not in custody, and not subject to any 'criminal prosecution.'  Inevitably, there were undesirable consequences flowing from the initial accusation

9

by the Army and the continuing investigation after the Army charges were dismissed. Indeed, even had there been no charges lodged by the Army, the ongoing comprehensive investigation would have subjected MacDonald to stress and other adverse consequences. However, <u>once the charges instituted by the Army were dismissed</u>, MacDonald was legally and constitutionally <u>in the same posture as though no charges had been made</u>. He was free to go about his affairs, to practice his profession, and to continue with his life."

<u>Id.</u> at 10 (emphasis added).

There is also support for the State's argument in <u>Ex parte Carrell</u>, 565 So. 2d 104 (Ala. 1990). In that case, Jerry Ray Carrell was indicted for various sex offenses in August 1984 and was arrested shortly thereafter. However, in September 1984, the State dismissed the charges, for reasons that are unclear. On November 18, 1985, Carrell was reindicted for the same sex offenses and was subsequently arrested. Carrell then filed a motion to dismiss the indictment, arguing that the State had violated his right to a speedy trial. The circuit court denied that motion, and Carrell later entered guilty pleas after reserving his right to appeal the denial of his motion to dismiss.

On appeal, the Alabama Supreme Court "agree[d] with the State that the defendant's right to a speedy trial was not triggered by the return of the 1984 indictment, because those charges were nol prossed by

the State." Carrell, 565 So. 2d at 107. Instead, the Court "accept[ed] November 18, 1985, as the date when the defendant's constitutional right to a speedy trial began [because] that was the date when the second indictment was returned." Id. The Court did note that it was "not persuaded that the dismissal of [the initial] charges, and the delay of over a year before the new indictment was returned, should be completely ignored." Id. However, the Court explained that the time before the second indictment might be relevant to Carrell's speedy-trial clock only if the State had dismissed the charges "in order to [gain] a prosecutorial advantage," id. at n.6, and, because there was no evidence to that effect, the Court ignored all the time before the second indictment.

We recognize that the initial proceedings in MacDonald and Carrell were terminated by the government's dismissal of the charges, whereas this case involves a no bill by a grand jury. We do not find that distinction to be significant, however, nor did the Mississippi Supreme Court find it to be significant in Moffett v. State, 49 So. 3d 1073 (Miss. 2010), which had a procedural history similar to the procedural history in this case.

In Moffett, Eric Moffett was arrested and charged with capital murder in December 1994, and he remained in custody until a grand jury

11

returned a no bill in September 1995. However, in 2002, the case was again presented to a grand jury following a review of the case file, and the grand jury indicted Moffett on April 9, 2002. Moffett then filed a motion to dismiss the indictment, arguing that the State had violated his right to a speedy trial. The State argued in response that, "once Moffett was released, [a speedy-trial analysis] became inapplicable, as no charges were pending and Moffett was living as a free man." Moffett, 49 So. 3d at 1083. Citing MacDonald, supra, the Mississippi Supreme Court agreed with the State, holding that "[n]o speedy-trial rights under the Sixth Amendment [were] applicable to the period after Moffett was released following the 1995 no-bill until after he was indicted in 2002." Moffett, 49 So. 3d at 1084. Moffett argued, though, that his case was distinguishable from cases in which the State dismisses a charge because, according to him, "a no-bill is not a formal dropping of charges comparable to the grant of nolle prosequi." Id. at 1086. The Court was not persuaded by Moffett's argument, noting that "the no-bill and release served the same purpose and had a similar effect," id., as the dismissal of the charge would have had in that, once Moffett was released from custody following the return of the no bill, he "'was legally and

12

constitutionally in the same posture as though no charges had been made'" and "was living as a free man." Id. at 1085 (quoting MacDonald, 456 U.S. at 10).

In this case, Williams was arrested for capital murder and incarcerated in 2004, but a grand jury returned a no bill on the capital-murder charge in 2006, and Williams was released from custody. Thus, it is clear from MacDonald, Carrell, and Moffett that the length of the delay for purposes of Williams's speedy-trial claim is not to be measured without interruption from the date of his 2004 arrest, as Williams argues it should be; rather, those cases make clear that the time between the 2006 no bill and the 2022 indictment is to be excluded from the length of the delay. The length of the delay therefore either must be measured from the date of the 2022 indictment, as the State argues it should be, or must be measured in two separate blocks of time: the postindictment delay plus the time that Williams was incarcerated from 2004 to 2006.

The Kansas Court of Appeals has noted that courts across the country are divided on this issue.

> "Some courts have concluded that a dismissal of the charges stops the constitutional speedy trial clock entirely and that when charges are refiled, the speedy trial clock begins anew (i.e., the time period prior to dismissal is not considered as

13

part of the delay in bringing the defendant to trial). Other courts have concluded that dismissal of charges merely tolls the constitutional speedy trial clock and that the time period before dismissal and the time period after charges are refiled constitute the applicable length of delay."

State v. Gill, 48 Kan. App. 2d 102, 112, 283 P.3d 236, 244-45 (2012) (citations omitted). See also State v. Norris, 302 A.3d 1, 11 (Me. 2023) (collecting cases that have adopted a "'resume' theory," in which the time before charges are dismissed is counted in the speedy-trial analysis when the charges are later reinstated, and cases that have adopted a "'reset' theory," in which that time is not counted in the speedy-trial analysis). Taking language from Gill, we have chosen to refer to these theories as the "begins anew" theory and the "tolling" theory.

Some courts have not adopted either the "begins anew" theory or the "tolling" theory as an absolute rule but, instead, have held that the circumstances of the case will determine which theory is applicable. For example, the Kansas Court of Appeals has held that,

"when the State dismisses a charge and files another one, the constitutional speedy trial clock will start anew in the second case if the State dismissed the first case because of necessity or the charge in the second case is not identical to the charge that was previously dismissed. If, however, the first case was not dismissed because of necessity and the charge in the second case is identical to the charge previously dismissed, then the dismissal of the first case will be

14

> construed as merely tolling the constitutional speedy trial clock."

Gill, 48 Kan. App. 2d at 113-14, 283 P.2d at 245-46. The Maine Supreme Court has also adopted a circumstances-based approach, holding that the speedy-trial clock is merely tolled when the State dismisses charges and then reindicts the defendant, "at least when the charges remain the same, the first case was dismissed on the ground that it was mistakenly filed in the wrong county, and the accused is immediately reindicted." Norris, 302 A.3d at 11-12.

We likewise find it prudent not to adopt either the "begins anew" theory or the "tolling" theory as an absolute rule because we can envision potential scenarios in which application of one theory is more just than application of the other when criminal proceedings are terminated and then later reinstated. After all, speedy-trial claims are inherently fact-specific claims, State v. Nov, 14 Wash. App. 2d 114, 128, 469 P.3d 352, 360 (2020), so the reason for the termination of the initial proceedings could be relevant in many cases. However, for reasons we will explain, we apply the "begins anew" theory in cases in which a grand jury returns a no bill, the accused is released from custody, and there is no evidence of bad faith by the State.

First, we are of course bound by <u>MacDonald</u> and <u>Carrell</u> to the extent that they speak to application of the "begins anew" and "tolling" theories. That said, neither of those decisions expressly addressed this issue, but both decisions appear to be in line with the "begins anew" theory. <u>MacDonald</u> held that, "once the charges instituted by the Army were dismissed, MacDonald was legally and constitutionally <u>in the same posture as though no charges had been made</u>," 456 U.S. at 10 (emphasis added), and <u>Carrell</u> "accepted [the date of the second indictment] as the date when the defendant's constitutional right to a speedy trial <u>began</u>." 565 So. 2d at 107 (emphasis added). Thus, although they did not expressly say so, both the <u>MacDonald</u> Court and the <u>Carrell</u> Court implicitly indicated that the initial speedy-trial clock had been extinguished by the dismissal of the defendant's charges and that a <u>new</u> speedy-trial clock had begun running on the date of the subsequent indictment. <u>See</u> <u>Commonwealth v. Butler</u>, 79 Mass. App. Ct. 751, 756, 949 N.E.2d 936, 940 (2011) (noting that the "begins anew" theory is "supported by the plain language of … <u>MacDonald</u>").

Second, we find the <u>MacDonald</u> Court's discussion of the primary purpose of the speedy-trial guarantee to weigh in favor of the "begins

16

anew" theory, at least in this type of case. As that Court noted, the right to a speedy trial "is not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations." MacDonald, 456 U.S. at 8. See also United States v. Loud Hawk, 474 U.S. 302, 311 (1986) ("The Speedy Trial Clause does not purport to protect a defendant from all effects flowing from a delay before trial."). Rather, the right to a speedy trial is primarily "designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." MacDonald, 456 U.S. at 8.

Those concerns are not an issue, though, once a charge is no-billed by a grand jury and the formerly accused is released from custody. Rather, at that point "the formerly accused is, at most, in the same position as any other subject of a criminal investigation," and, because he "'suffers no restraints on his liberty and is [no longer] the subject of public accusation[,] his situation does not compare with that of a defendant who has been arrested and held to answer.'" MacDonald, 456

17

U.S. at 8-9 (quoting <u>United States v. Marion</u>, 404 U.S., 307, 321 (1971)). Indeed, Williams has conceded that "[a] reasonable person could assume after a no bill of the grand jury in a criminal case … that he is free of the allegations causing his arrest" (C. 116), i.e., that the proceedings had come to an end. Thus, if Williams was living "free of the allegations" after the 2006 no bill, as he concedes he was, then he was not living in the shadow of a looming prosecution and almost certainly did not expect any trial at that point, much less a speedy one. It seems logical to conclude, then, that the 2006 no bill served to extinguish the speedy-trial clock that began running with Williams's 2004 arrest and that a new speedy-trial clock began running upon the return of the 2022 indictment.

We recognize that the use of the "begins anew" theory creates the opportunity for the State to attempt to manipulate the system. As the United States Court of Appeals for the First Circuit has noted, under that theory the State "would be able to nullify a defendant's speedy trial right by the simple expedient of dismissing and reindicting whenever speedy trial time was running out on its prosecution." <u>United States v. Colombo</u>, 852 F.2d 19, 23-24 (1st Cir. 1988). However, <u>MacDonald</u> and <u>Carrell</u> both make clear that the State cannot terminate criminal proceedings in bad

18

faith and then obtain the benefit of a speedy-trial clock that starts over with a later arrest or indictment -- a rule that serves as a safeguard against the justifiable concern expressed by the First Circuit. That concern is not an issue in this case, though, because Williams has not alleged that the State acted in bad faith to ensure the termination of the proceedings in 2006. To the contrary, Williams conceded below and has continued to concede on appeal that the State's delay in prosecuting him has been purely negligent.

For the foregoing reasons, we apply the "begins anew" theory in this case, which is to say that the speedy-trial clock that began running upon Williams's 2004 arrest was extinguished by the 2006 no bill and Williams's regained freedom. A new speedy-trial clock of course began running upon the return of the May 12, 2022, indictment, but it began running as of that date, with no consideration given to the 17 months that Williams was incarcerated 15 years earlier. And, as we have already explained, MacDonald and Carrell make clear that the time between the 2006 no bill and the 2022 indictment also does not count toward the speedy-trial clock. What remains, then, is the delay that occurred from the date of the indictment -- May 12, 2022 -- to the date Williams's trial

19

was scheduled to occur -- March 11, 2024 -- which is a delay of 22 months. See Jones, 35 So. 3d at 646 (measuring the length of the delay, in a case in which the indictment was dismissed, from the date of the defendant's arrest to the date her trial was scheduled to occur).

There is no bright line at which the length of the delay in a criminal proceeding becomes presumptively prejudicial so as to trigger an analysis of the remaining Barker factors. Rather, "'[w]hether the length of delay is presumptively prejudicial is "necessarily dependent upon the peculiar circumstances of the case."'" D.B., 861 So. 2d at 18 (quoting Nickerson v. State, 629 So. 2d 60, 64 (Ala. Crim. App. 1993), quoting in turn Barker, 407 U.S. at 531). Thus, delays longer than 22 months have been held not to be presumptively prejudicial, while delays less than 22 months have been held to be presumptively prejudicial. See D.B., 861 So. 2d at 18 (citing cases in which delays of 29 months, 26 months, and 25 months were held not to be presumptively prejudicial but also citing cases in which delays of 19 months and 16 months were held to be presumptively prejudicial).

However, it does not appear that this Court has ever found a delay in the vicinity of 22 months to be presumptively prejudicial in a capital-

murder case, which will often necessarily involve more delay than less complex cases, especially when the State is seeking the death penalty, which appears to be the case here. (C. 51.) See Coral v. State, 628 So. 2d 954, 966 (Ala. Crim. App. 1992) (noting the "complicated" nature of capital-murder cases); and United States v. Dennard, 722 F.2d 1510, 1513 (11th Cir. 1984) ("Greater delay is permissible in prosecuting a complex case than in prosecuting a simple one." (citing Barker, supra)). In fact, this Court noted 11 years ago that it was "unaware of … any Alabama capital-murder case in which a delay of 21 months was considered presumptively prejudicial," Scheuing v. State, 161 So. 3d 245, 288 (Ala. Crim. App. 2013), and we still have not found such a case. Instead, it appears that much longer delays are required to proceed past the first Barker factor in capital-murder cases, see, e.g., Knight v. State, 300 So. 3d 76 (Ala. Crim. App. 2018) (55 months); Gaston v. State, 265 So. 3d 387 (Ala. Crim. App. 2018) (50 months); and Boyle v. State, 154 So. 3d 171 (Ala. Crim. App. 2013) (48 months), and that the shortest delay to have been found to be presumptively prejudicial in a capital-murder case is 29 months, which is 7 months longer than the delay that occurred

in this case. See Graham v. State, 299 So. 3d 273 (Ala. Crim. App. 2019); and Ex parte Hamilton, 970 So. 2d 285 (Ala. 2006).[4]

We see no compelling reason to break new ground in this capital-murder case and therefore hold, consistent with prior Alabama caselaw, that the 22-month postindictment delay that occurred in this case is not presumptively prejudicial. Thus, Williams's speedy-trial claim fails on the first Barker factor, and, as a result, there is no need for this Court to consider the remaining Barker factors. See Summerlin, 594 So. 2d at 237 (holding that, because the length of the delay was "not presumptively prejudicial," this Court was "not required to address the remaining three

_____

[4]In Ex parte Hamilton, the State argued that the length of the delay was 23 months instead of 29 months because, according to the State, some of the delay was attributable to the defendant. The Alabama Supreme Court rejected that argument, but, in doing so, stated in a footnote that, even if it found the delay to be 23 months, that would still be "enough under the circumstances of this case to trigger an examination of the remaining Barker factors." 970 So. 2d at 289 n.5. However, because the Court found the delay to be 29 months, that statement was not necessary to the Court's decision and was therefore dicta that does not constitute binding precedent. See Ex parte Patton, 77 So. 3d 591, 596 (Ala. 2011) ("Because the language included in note 3 was … not essential to this Court's ultimate holding …, it was … nothing more than dicta and was not binding in subsequent cases."). Thus, the fact remains that, in terms of binding precedent, the shortest delay to have been found to be presumptively prejudicial in a capital-murder case is 29 months.

22

[Barker] factors"). Nevertheless, it is not uncommon for this Court to address the remaining Barker factors even when the length of the delay is not presumptively prejudicial. See, e.g., State v. Johnson, 900 So. 2d 482 (Ala. Crim. App. 2004). We therefore briefly note that Williams's speedy-trial claim also fails on the fourth Barker factor, i.e., whether Williams was prejudiced by the delay.

To prevail on the fourth Barker factor, a defendant must show that he suffered actual prejudice from the State's delay in prosecuting him, unless the facts warrant a finding of presumed prejudice. Horton v. State, 369 So. 3d 1128, 1134 (Ala. Crim. App. 2022). The defendant generally is not entitled to a finding of presumed prejudice, however, unless the first three Barker factors all weigh heavily in his favor or there was a negligent delay of at least five years. Id. Here, the State's negligent delay amounts to only 22 months, and though negligent delay weighs against the State, it does not weigh heavily against it. See Quinnie v. State, 382 So. 3d 1275 (Ala. Crim. App. 2022) (holding that a 41-month negligent delay weighed against the State but did not weigh heavily against it). Thus, to prevail on his speedy-trial claim, Williams had the burden of demonstrating actual prejudice. See Horton, 369 So.

23

3d at 1135 (holding that the defendant was not entitled to a presumption of prejudice based on a 43-month negligent delay).

In this case, the circuit court found that Williams had suffered actual prejudice and, in support of its finding, stated:

"The court recognizes that over time witnesses may become unavailable and that the recollections of the remaining witnesses may have been diminished over time. The court also realizes that these potentialities work against both the defendant and the State, absent a specific showing to the contrary. Here, [Williams] has made such a showing of prejudice resulting from the delay. The parties agree that at least two witnesses who were interviewed by investigators in 2004 have since died. The victim's wife, Jimmie Mae Jackson, died on June 23, 2007. Another witness, James Tatum, a neighbor who lived near Johnnie Jackson's residence, died on March 3, 2021. Both of these deaths add to the prejudice suffered by Williams because of the negligent delay [by] the State."

(C. 150.)

However, the mere fact that two witnesses have died is not sufficient, in and of itself, to establish actual prejudice to Williams. As this Court has explained in a previous case:

"The prejudice that Cartwright argues on appeal is … that 'witnesses have become unavailable, memories have faded, and evidence has likely become unavailable.' Cartwright fails to state what witnesses and evidence have become unavailable or what witness testimony would have been had his trial been earlier. 'As this Court has held, [Cartwright] must point to specific facts in evidence in order

24

to support his claim of actual prejudice.' Irvin [v. State], 940 So. 2d [331,] 344 [(Ala. Crim. App. 2005)]. '"'[S]peculative allegations, such as general allegations of loss of witnesses and failure of memories, are insufficient to demonstrate the actual prejudice ....'" that the appellant must establish.' Id. (quoting Haywood v. State, 501 So. 2d 515, 518 (Ala. Crim. App. 1986), quoting in turn United States v. Butts, 524 F.2d 975, 977 (5th Cir. 1975), citing United States v. McGough, 510 F.2d 598, 604 (5th Cir. 1975)). 'Because [Cartwright] does not identify these supposedly critical defense witnesses <u>or attempt to explain how these unidentified witnesses were crucial to his defense</u>, he has failed to establish [sufficient] prejudice as a result of the [49-month] delay between arrest and trial.' Id. at 344."

Cartwright v. State, 346 So. 3d 22, 35-36 (Ala. Crim. App. 2020) (emphasis added; citation to appellant's briefs and footnote omitted).

In this case, Williams made no attempt whatsoever to demonstrate to the circuit court what testimony the deceased witnesses could have provided. It therefore requires pure speculation to conclude that the deceased witnesses could have aided Williams's defense; in fact, the State noted at the hearing on Williams's motion that one of the deceased witnesses, Jackson's wife, would have been a witness for the State (R. 24), so it appears that the loss of that witness might have actually benefited Williams. Regardless, without any information regarding the deceased witnesses' potential testimony, this Court simply cannot say that Williams suffered any actual prejudice as a result of the State's

25

delay in prosecuting him. Thus, "'with no presumed prejudice and [no] actual prejudice …, the delay did not violate [Williams's] right to a speedy trial." Horton, 369 So. 3d at 1139-40 (quoting Jones, 35 So. 3d at 659).

Having concluded that Williams's speedy-trial claim lacks merit, we note that the preindictment delay that occurred in this case from 2004 to 2022 would certainly be relevant to a due-process claim, as MacDonald makes clear.[5] However, Williams never raised a due-process claim below, even after the State argued that a due-process claim is the applicable framework in this case, and the circuit court did not find a due-process violation. Regardless, to prevail on this type of due-process claim, the defendant has "'a heavier burden of proof'" than that required for a speedy-trial claim and must demonstrate not only "'"that the delay caused actual prejudice to the conduct of his defense"'" but also "'"that the delay was the product of deliberate action by the government designed to gain a tactical advantage."'" R.D.H. v. State, 775 So. 2d 248, 251 (Ala. Crim. App. 1997) (citations omitted). Here, Williams conceded

---

[5]The MacDonald Court also noted that a defendant might be protected from excessive preindictment delay by a statute of limitations, but there is no statute of limitations for capital offenses in Alabama. See § 15-3-5(a)(1), Ala. Code 1975.

below and continues to concede on appeal that the preindictment delay in this case was attributable to the State's negligence, not its "'"deliberate action … designed to gain a tactical advantage."'" Id. (citations omitted). Thus, no due-process violation occurred. See D.B., 861 So. 2d at 17 n.2 (noting, even though the defendant had not raised a due-process claim, that "there was no due process violation" because the defendant had "not shown that the prearrest/preindictment delay caused actual prejudice to his defense or that the delay was deliberate on the part of the State in order to gain a tactical advantage").

In short, Williams's speedy-trial claim fails under both the first and fourth Barker factors, and there was no due-process violation because Williams did not allege, much less demonstrate, that the preindictment delay was the result of the State's deliberate action designed to gain a tactical advantage. Thus, the circuit court erred by dismissing the indictment charging Williams with capital murder. We therefore reverse the circuit court's judgment and remand the case for that court to reinstate the indictment.

REVERSED AND REMANDED.

27

Windom, P.J., and Kellum, J., concur.  Minor, J., concurs in part and concurs in the result, with opinion.  Cole, J., concurs in the result.

MINOR, Judge, concurring in part and concurring in the result.

I believe the result of the Court's decision today—the reversal of the Montgomery Circuit Court's judgment dismissing the indictment charging Ray Charles Williams with capital murder—is correct. I write separately to note (1) that I think the 22-month delay in Williams's case is presumptively prejudicial under the first factor for evaluating a speedy-trial claim under <u>Barker v. Wingo</u>, 407 U.S. 514 (1972), and (2) that Alabama law permits a court, in evaluating whether there is prejudice under the fourth <u>Barker</u> factor, to consider preindictment or prearrest delay.

I concur with the Court's endorsement of a circumstances-based approach to find the starting point of the "speedy trial clock" when previously dismissed charges against a defendant are later resumed. I also agree with the Court's finding that the clock started on Williams's second indictment in May 2022, and thus the length of the delay under the first <u>Barker</u> factor is 22 months.

As the Court explains, unless the length of the delay is "presumptively prejudicial" under the first <u>Barker</u> factor, there is no need to evaluate the remaining <u>Barker</u> factors. In its brief, the State argues

that "[o]nly the period of delay attributable to official negligence is counted to determine presumptive prejudice under Barker and its progeny." (State's brief, p. 18 (emphasis added).) The State cites Dennis v. State, [Ms. SC-2023-0146, Nov. 17, 2023] \_\_\_ So. 3d \_\_\_ (Ala. 2023), in support of that proposition.

In Ex parte Walker, 928 So. 2d 259 (Ala. 2005), the Alabama Supreme Court distinguished "presumptive prejudice" under the first Barker factor and "presumed prejudice" under the fourth Barker factor:

> "In analyzing the length of delay under the first Barker factor, we use the term 'presumptive prejudice' to refer to a delay that is lengthy enough to trigger inquiry into the remaining Barker factors. See Barker, 407 U.S. at 530, 92 S. Ct. 2182 ('Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'); [Ex parte] Carrell, 565 So. 2d [104,] 107-08 [(Ala. 1990)] (concluding that a delay of more than 33 months was 'presumptively prejudicial' under the first Barker factor).
>
> "By contrast, in analyzing under the fourth Barker factor the prejudice caused to an accused by the delay, we use 'presumed prejudice' or 'prima facie prejudice' to mean that the accused is relieved of the burden of establishing that the delay actually prejudiced her."

928 So. 2d at 264 n.6 (citations omitted). The Alabama Supreme Court in Dennis recognized that "prejudice cannot be presumed based on the entire post-indictment period as such but, rather, only on whatever

subset of that period was caused by government misfeasance."[6] Dennis, ___ So. 3d at ___ (emphasis added). That statement applies not to a finding of presumptive prejudice under the first Barker factor (which triggers an examination of other Barker factors) but to when prejudice may be presumed under the fourth Barker factor. Thus, the State is incorrect to the point that it suggests that only delay attributable to the State "counts" under the first Barker factor.

The Court concludes that the 22-month delay in Williams's case is not presumptively prejudicial under the first Barker factor, reasoning that this Court has never found a 22-month delay to be presumptively prejudicial in a capital-murder case. Although that appears to the case, in discussing what is "presumptively prejudicial" under the first Barker factor, Ex parte Walker cites "federal cases that generally hold that a delay of approximately one year or more is presumptively prejudicial." 928 So. 2d at 265 (citations omitted), a point echoed in Ex parte Hamilton,

---

[6]In analyzing the second Barker factor, the Alabama Supreme Court explained in Ex parte Walker: "'Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.'" Ex parte Walker, 928 So. 2d 259, 265 (Ala. 2005) (emphasis added; citation omitted).

970 So. 2d 285 (Ala. 2006). The Court in Ex parte Hamilton emphasized

a circumstances-based approach to evaluating a speedy-trial claim:

> "This Court in Walker did not hold—and we do not hold in this case—that a trial court, in addressing a speedy-trial claim and applying the Barker factors, should rely solely on the analysis applied in criminal proceedings in the federal system. Rather, a trial court should reach a decision that protects the defendant's right to a speedy trial within this State's criminal-justice system. Accordingly, a trial court evaluating a speedy-trial claim should be mindful of the circumstances, rules, and procedures involved in the prosecution of a criminal defendant in this State, which may differ significantly from the circumstances, rules, and procedures in a criminal proceeding in the federal system."

970 So. 2d 290 n.4. Examining the first Barker factor, the Court noted:

> "The State argues that the length of delay in this case should be measured from Hamilton's arrest until his indictment, which length of delay, the State contends, is 15 months rather than 21 months because some of that delay was attributable to Hamilton. The State argues that two periods of time should not be included in measuring the length of the delay. First, the State argues that the two-month period from May 12, 2003, until June 18, 2003, should be excluded, because, the State contends, the delay during that time was attributable to Hamilton's request for a preliminary hearing. … Second, the State argues that an additional time of roughly four months—from November 15, 2004, until March 9, 2005—should be excluded, because that delay was caused by Hamilton's request for a continuance in November 2004 and the parties' 'agreement' in January 2005 to continue the case until March 2005. Therefore, the State contends that the length of the delay in Hamilton's case is not presumptively prejudicial. We disagree."

970 So. 2d at 290 n.5. Although the Court in Ex parte Hamilton pushed back on the State's invitation to subtract in the first Barker factor the delay attributable to the defendant, it also stated that, "[e]ven if we exclude the 6 months' delay that the State asserts was caused by Hamilton, the delay was still 23 months, which is enough under the circumstances of this case to trigger an examination of the remaining Barker factors." 970 So. 2d at 289 n.5. Given that the Court assumed a 23-month delay in Hamilton's case was presumptively prejudicial, I think the 22-month delay in Williams's case warrants a look at the other Barker factors. Although the Court concludes that it need not look at the other factors here, it examines the fourth Barker factor, holding that there has been no showing of actual prejudice under the fourth Barker factor. I concur with that holding.

Finally, while I agree with this Court's statement "that the preindictment delay that occurred in this case from 2004 to 2022 would certainly be relevant to a due-process claim," ___ So. 3d at ___, I note that the Alabama Supreme Court has considered such delay in evaluating whether prejudice exists under the fourth Barker factor. In Ex parte Carrell, 565 So. 2d 104 (Ala. 1990), although the Court held that the

33

speedy-trial clock started on the second indictment, the Court considered the time before the second indictment in its prejudice analysis of Carrell's speedy-trial claim. That delay seemed to be the turning point in the Supreme Court's finding of prejudice under the circumstances of that case:

> "While the record does not show why the initial charges were dismissed, it would appear that defendant, at the time of the dismissal, had a right to assume that he would not be charged again, and unexcused inaction in a case involving alleged sexual misconduct involving children could be especially prejudicial to a defendant, because the prosecution must depend on the testimony of the alleged victims in many cases."

565 So. 2d at 109. Although the delay from the second indictment to the guilty plea in Ex parte Carrell was around 33 months, the Court reversed this Court's judgment affirming the trial court's judgment and rendered a judgment in Carrell's favor. The defendant in Ex parte Walker argued that the Ex parte Carrell Court had presumed prejudice and should do so in her case, but the Court in Ex parte Walker distinguished Ex parte Carrell based on five circumstances in that case—including circumstances before the second indictment. Ex parte Walker, 928 So. 2d at 274-75.

34

That said, I agree with this Court's conclusion that Williams's speedy-trial claim lacks merit.